RECEIVED
IN ALEXANDRIA, LA.

AUG 1 8 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## ALEXANDRIA DIVISION

| | |
|---|---|
| **CITY OF ALEXANDRIA** | **CIVIL ACTION NO. 1:05-cv-01121** |
| -vs- | **JUDGE DRELL** |
| **CLECO CORP. et al.** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

Pending before the Court is a Motion for Partial Summary Judgment (Doc. 165) filed by Intervenor Defendant the City of Alexandria ("City"), and former Intervenor Defendants Mayor Jacques Roy ("Mayor Roy") and City Attorney Charles E. Johnson ("Mr. Johnson").  Magistrate Judge Hill issued a Report and Recommendation on Motion for Partial Summary Judgment suggesting that we grant the City's motion. (Doc. 382).  As Mayor Roy and Mr. Johnson have been dismissed from the lawsuit as intervenor defendants (Doc. 434), the City is now the only remaining movant.  For the reasons detailed below, the City's motion (Doc. 165) will be GRANTED.  Disposition will follow by a separate judgment.

## I.    **Background**

The claims presently before the Court relate to Ms. Brown's intervention in the principal litigation ("Cleco litigation").  This lawsuit was originally filed by the City against Cleco Corp. *et al.* (collectively, "Cleco"), the City's primary electrical utility services provider.  In the main demand, the City alleged that Cleco caused the City and its ratepayers substantial economic losses through a series of intentional and

negligent acts of mismanagement.  The parties ultimately reached a settlement, and the Court dismissed the claims against Cleco on February 24, 2010.  (Doc. 379).

During the pendency of the Cleco litigation, the City administration requested that the Alexandria City Council ("City Council") grant the City approval to retain attorneys to represent the City.  Edward G. Randolph ("Mayor Randolph") was mayor of Alexandria at that time.  On July 19, 2005, the City Council complied and adopted ordinance No. 214-1005 (Doc. 77-1, Exh. 3) ("Ordinance").  The Ordinance authorized Mayor Randolph to "enter into a Professional Services Agreement with . . . Bridgett Brown," as well as several other attorneys.  (Doc. 77-1, Exh. 3, p. 1).[1]  The effect of the Ordinance was conditioned upon Mayor Randolph's signature, any invalid clauses were declared severable, and any conflicting ordinances were repealed.

Subsequently, Ms. Brown entered into an undated "Contract for Legal Services and Contingent Fee Agreement" ("Contract") with the City.  (Doc. 77-1, Exh. 1).  Both Mayor Randolph and Ms. Brown signed the Contract.  The City was designated as the "Client" in the document, while Ms. Brown was referred to as "Attorney." (Doc. 77-1, Exh. 1, p. 1).  Under the Contract, Ms. Brown was retained "to represent [Client] in all claims related to any and all transactions and/or any and all other relationships Client has or had with Cleco." (Doc. 77-1, Exh. 1, p. 1).  Importantly, the Contract also provided that, "[s]hould Client discharge Attorney for any reason, Client authorizes Attorney to initiate proceedings and/or intervene in any proceedings for fees, costs, advances, guarantees, and any other sums to which Attorney is entitled." (Doc. 77-1,

---

[1] The other attorneys named in the Ordinance were John M. Sharp, H. Craig Davidson, Jr., and Philip Hunter.  (Doc. 77-1, Exh. 3, p. 1).

2

Exh. 1, p. 1).[2]

In November 2006, Mayor Roy was elected, and he appointed Charles E. Johnson, Jr. ("Mr. Johnson") as city attorney.  Mr. Johnson assumed responsibilities as city attorney in January 2007.  Shortly thereafter, on February 28, 2007, Mr. Johnson issued a letter to Ms. Brown terminating her representation of the City in the Cleco litigation.  (Doc. 77-1, Exh. 2).  In this termination letter, Mr. Johnson claimed, without detailed explanation, that Ms. Brown had violated Rule 1.8(b) of the Louisiana Rules of Professional Conduct, which states that "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules."  Moreover, Mr. Johnson claimed that Ms. Brown's "actions have created an incurable conflict of interest with the elected chief administrator of this City."  (Doc. 77-1, Exh. 2, p. 2).  Accordingly, Mr. Johnson requested that Ms. Brown "return the entire file, less any work product," "refrain from any representation, further contact, or communication regarding this case," and submit a "detailed itemization" of her work on the case.  (Doc. 77-1, Exh. 2, p. 2).

Instead, on April 17, 2007, Ms. Brown filed a petition (or complaint) for intervention in the principal litigation.  (Doc. 77).  In this initial complaint, Ms. Brown sought to recover "fees, cost [sic], and expenses as outlined in the Contract."  (Doc. 77, p. 1).  More specifically, the Contract provided for a contingency fee of "ten

---

[2] Two formerly controversial points should be clarified.  First, Ms. Brown's client was the City, and was not the City Council.  Second, Ms. Brown was retained as "special legal counsel" under the Charter.  The magistrate judge agreed with both of these conclusions, and Ms. Brown expressed her assent to them as well in her filings with this Court.  (Doc. 384-1, p. 2).

percent (10%) of the underlying amount recovered including judicial interest." (Doc. 77-1, Exh. 1, p. 2). Ms. Brown later filed two amended complaints which have little bearing on the proceedings at this point.[3]

The City filed the instant Motion for Partial Summary Judgment (Doc. 165) on March 5, 2009. In its motion, the City contends that, as a matter of law, Mr. Johnson had the authority to terminate Ms. Brown's Contract.[4] The motion necessitates a legal interpretation of Ms. Brown's Contract and the City's Charter, and a determination of the extent of Mr. Johnson's authority, under those documents, to terminate Ms. Brown's representation of the City in the Cleco litigation. On March 11, 2010, the magistrate judge issued a Report and Recommendation suggesting that we grant the City's motion. (Doc. 382). After carefully reviewing all of the parties' submissions, we are compelled to approve the magistrate judge's recommendation and to grant the City's motion.

## II.   **Law and Analysis**

### A.   **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), the Court will grant a party's motion for summary judgment only if:

---

[3] Ms. Brown's first amended complaint (Doc. 152) added various factual allegations, as well as two additional counts (for tortious interference with contract and defamation) and two additional defendants (Mayor Roy and Mr. Johnson) to the lawsuit. These additional counts and defendants have now been dismissed from the lawsuit. (Docs. 433-35). Ms. Brown's second amended complaint (Doc. 199) contained further, more specific, factual allegations purporting to support Ms. Brown's tort claims.

[4] Ms. Brown suggests that there may be a question as to whether Mr. Johnson intended to terminate only her involvement with the Cleco litigation, or her legal services to the City altogether. As we will clarify, the Contract applies only to Ms. Brown's representation of the City in the Cleco litigation. Therefore, terminating Ms. Brown's involvement in the Cleco litigation was the functional equivalent of terminating her Contract. We thus use the phrases interchangeably.

4

> the pleadings, the discovery and disclosure materials on file, and any
> affidavits show that there is no genuine issue as to any material fact and
> that the movant is entitled to judgment as a matter of law.

A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

In conducting this analysis, the Court must construe "all of the evidence and all of the factual inferences from the evidence . . . in a light most favorable to the party opposing the motion." King Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510, 517 (5th Cir. 2009).  Any doubts are likewise resolved in favor of the nonmoving party. U.S. ex rel. Longhi v. United States, 575 F.3d 458, 465 (5th Cir. 2009).  Once the movant has directed the Court's attention to portions of the record which reflect the absence of a genuine issue of material fact, the nonmoving party bears the burden of demonstrating that a genuine issue of material fact exists.  United States v. $ 92,203.00 in U.S. Currency, 537 F.3d 504, 506-07 (5th Cir. 2008).  "However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996).

**B.     Discovery**

Ms. Brown first argues that the magistrate judge "addressed the merits of the defendant's motion without giving [her] *any opportunity* for discovery. . . . [and] failed to acknowledge . . . the evidence she assembled through informal means." (Doc. 384-1, p. 1).  This is a threshold question which must be addressed before proceeding to

the merits of the City's motion.  Ms. Brown requests, at a minimum, the opportunity to depose Mr. Roy and Mr. Johnson in an effort to oppose the City's motion.

The City argues that its motions presents a single, purely legal issue, which can be divided into two questions: "(1) does the Alexandria City Charter grant [Mr. Johnson] . . . the authority to terminate [Ms.] Brown's contract; and (2) has that contract been legally terminated?" (Doc. 390, p. 2).  Ms. Brown, however, argues that no discovery has taken place, and that the following genuine issues of material fact remain to be determined: (1) what the intent of Mr. Johnson's letter to Ms. Brown may have been – to terminate Ms. Brown's involvement in the Cleco litigation only, or her representation of the City altogether; and (2) what role Mayor Roy played in the decision to terminate Ms. Brown's representation of the City, and whether Mayor Roy had a substantial financial interest in the Cleco litigation, which may have prohibited him, under the Charter, from being involved in any decision regarding the litigation.

1.   *The Stay on Discovery*

We begin by considering Ms. Brown's general claim that she has been afforded an inadequate opportunity to conduct discovery.  By way of background, this Court entered an order severing Ms. Brown's intervention from the main demand in accordance with Fed. R. Civ. P. 21 on May 30, 2007.  (Doc. 89).  In that same order, the Court stayed any discovery related to the intervention "pending conclusion of the [then-]existing mediation proceedings on the main demand." (Doc. 89, p. 1).  Then, after being advised that the main demand had been (at least tentatively, and as it

6

turned out, temporarily) resolved, the Court entered an Order of Dismissal (Doc. 143)
on December 31, 2008. (Doc. 143). Based upon this purported settlement, the Court
referred Ms. Brown's intervention to the magistrate judge for further proceedings,
bearing in mind that the dismissal of the main demand was entered without
prejudice to the right of either party to move to reopen the case. (Doc. 145).

Shortly thereafter, on January 14, 2009, the parties to the intervention
participated in a status conference. The magistrate judge lifted the stay solely to
allow Ms. Brown to file an amended intervenor complaint, but anticipated that the
stay would be "finally lifted" at the second status conference. (Doc. 147). That,
however, was not to be. The conference took place on March 11, 2009, and the
magistrate judge ordered that "[t]he stay **shall remain in effect** until the Motion to
Dismiss . . . and the Motion for Partial Summary Judgment . . . are decided." (Doc.
169). On April 15, 2009, the magistrate judge held a hearing to discuss various
aspects of the intervention, and took under advisement both pending motions. (Doc.
198). Shortly thereafter, the magistrate judge granted a motion by Ms. Brown to
expedite consideration of the motion for partial summary judgment, but denied Ms.
Brown's motion to file supplemental exhibits, because such filings were "not only
clearly untimely, but also manifestly unfair to the movant." (Doc. 202).

The intervention thus moved forward, with discovery still technically stayed,
until the City moved to reopen the case as to the main demand on August 28, 2009.
(Doc. 210). The Court granted the City's motion, reinstating litigation of the main

7

demand and, at least tacitly, halting consideration of the pending motions in the intervention.  (Doc. 238).  When the claims in the main demand were settled and dismissed on February 24, 2010 (Doc. 379), the magistrate judge then promptly issued his recommendations less than one month later.  Thus, the stay on discovery has continued to and still does remain in effect.  Given that fact, the question before us is whether we may properly rule upon the City's motion for partial summary judgment without affording Ms. Brown an opportunity to conduct discovery.

As a general principle, summary judgment may be granted only "[a]fter adequate time for discovery."  Versai Mgmt. Corp. v. Clarendon Am. Ins. Co., 597 F.3d 729, 735 (5th Cir. 2010).  The requirement that the nonmoving party set forth specific facts showing that there is a genuine issue of material fact is "qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  Anderson, 477 U.S. at 250 n.5.[5]  In short, we agree that, at least as a general principle, "[s]ummary judgment assumes some discovery."  Brown v. Miss. Valley State Univ., 311 F.3d 328, 333 (5th Cir. 2002).

However, it is well settled that "a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when the record shows that the requested discovery is not likely to produce the facts

---

[5] Although Ms. Brown has not formally made a Rule 56(f) motion, the principles embodied in that provision are nonetheless applicable.  "A non-movant seeking relief under Rule 56(f) must show: (1) why he needs additional discovery and (2) how that discovery will create a genuine issue of material fact."  Adams v. Travelers Indem. Co. of Conn., 465 F.3d 156, 162 (5th Cir. 2006).

8

needed by plaintiff to withstand a . . . motion for summary judgment." Paul Kadair, Inc. v. Sony Corp. of Am., 694 F.2d 1017, 1029-30 (5th Cir. 1983). A party requesting further discovery "'cannot evade summary judgment simply by arguing that additional discovery is needed,' and may not 'simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.'" Adams, 465 F.3d at 162 (quoting Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 305 (5th Cir. 2004)). In other words, discovery cannot be a mere "fishing expedition," but rather, counsel must "state with some precision the materials he hoped to obtain with further discovery, and exactly how he expected those materials would assist him in opposing summary judgment." See Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1442 (5th Cir. 1993).

In this case, we find that Ms. Brown is not entitled to additional discovery before we rule upon the City's motion for partial summary judgment. We base this conclusion upon a number of related factors. First, it is not necessarily fatal to the City's motion that no formal discovery has taken place. In some circumstances, a motion for summary judgment may properly be granted when no discovery has yet been conducted.[6] We recognize that this is not the typical approach.[7] However, this

---

[6] See, e.g., Bauer v. Albemarle Corp., 169 F.3d 962, 968 (5th Cir. 1999) ("[A] summary judgment motion can be decided without any discovery."); United States v. Bloom, 112 F.3d 200, 205 n.17 (5th Cir. 1997) ("The summary judgment rule does not require that any discovery take place before summary judgment can be granted."); Myers v. Miss. Office of Capital Post-Conviction Counsel, No. 3:10cv53-DPJ-FKB, 2010 WL 2195429, at *2 (S.D. Miss. May 28, 2010) ("'It is well established in the Fifth Circuit that 'Rule 56 does not require that any discovery take place before summary judgment can be granted.'") (quoting Washington v. Allstate Ins. Co., 901 F.2d 1281, 1285 (5th Cir. 1990)); Fresh Am. Corp. v. Wal-Mart Stores, Inc., No. Civ.A. 3:03-CV-1299, 2004 WL 983615, at *5 (N.D. Tex. Apr. 29, 2004) ("Although summary judgment usually assumes some discovery . . . Rule 56 does not require discovery

particular motion for partial summary judgment (as we will discuss more fully below) simply does not warrant discovery beyond a number of documents, including the Ordinance, the Charter, the Contract, and the termination letter.  Those documents were attached to Ms. Brown's original complaint, and have been reproduced, parsed, and scrutinized as part of this motion.

Furthermore, the City is correct that the question presented by its motion is a purely legal one: whether Mr. Johnson had authority to terminate her contract, and whether that termination was effective.  This question has been so framed, and limited, since the City's initial filing of the motion: "[T]he city attorney of Alexandria had authority to terminate the [Contract] . . . between the City and . . . [Ms.] Brown, and thus, the Contract was properly and fully terminated."  (Doc. 165, p. 1).  Likewise, it is the same question that the magistrate judge answered in his report and recommendation: "The undersigned finds that [Mr.] Johnson, as City Attorney, had the authority under the Home Rule Charter, to terminate [Ms.] Brown's contract." (Doc. 382, p. 13).

Once again, addressing this narrow issue requires only that we interpret the few relevant documents – nothing more.  In cases involving purely legal questions,

---

before summary judgment can be granted."); Richards v. Kmart Corp., No. CIV.A. 3:99CV2722-P, 2001 WL 285240, at *4 (N.D. Tex. Mar. 19, 2001) ("The Court rejects Plaintiff's assertion that a no evidence summary judgment is inappropriate. The Court may grant summary judgment without any discovery.").

[7] See generally Brown, 311 F.3d at 333 ("'Summary judgment is appropriate if, *after discovery*, there is no genuine dispute over any material fact.'") (quoting F.D.I.C. v. Shrader & York, 991 F.2d 216, 220 (5th Cir. 1993)).

10

courts have repeatedly held that discovery is not warranted, because under such circumstances, discovery cannot produce any facts upon which the motion may be denied.[8] Such is the case here, where the question before the Court involves a purely legal determination of a city attorney's authority to terminate a contract for legal services.  Because our disposition of this motion turns solely upon questions of law, and not fact, no discovery would impact whether the City is entitled to judgment as a matter of law.

Moreover, while there was no period during which formal discovery was taken in this case, Ms. Brown has filed at least some evidence to support her position. Specifically, with her opposition to the motion, Ms. Brown filed a number of exhibits, including the key documents involved in the motion, two video exhibits, a declaration, and several affidavits (one of which was her own).  (Doc. 178).  The Court is not suggesting that evidence such as this, which Ms. Brown claims to have

---

[8] See, e.g., Burton v. Banta Global Turnkey Ltd., 170 F. App'x 918, 925 n.7 ("Because preemption is a purely legal issue, this ruling of the district court [granting a motion for summary judgment] is unaffected by any discovery issues."); Brazos Valley Coalition for Life, Inc. v. City of Bryan, 421 F.3d 314, 327 (5th Cir. 2005) ("Appellants do not even attempt to show, nor can we readily imagine, how any additional discovery would have been necessary to answer these purely legal questions [regarding damages]."); Rosas v. U.S. Small Bus. Admin., 964 F.2d 351, 359 (5th Cir. 1992) ("As the issues to be decided by the district court were purely legal in nature, the court did not abuse its discretion in deciding the summary judgment motion prior to completion of discovery."); Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 892 F.2d 1238, 1269 (5th Cir. 1990) (affirming a district court's decision to grant summary judgment motions "with no discovery having been taken," because "many of the issues raised by the summary judgment motions were purely legal and that discovery would therefore not aid their resolution"); Myers, 2010 WL 2195429, at *2 ("Even if Plaintiff moved under Rule 56(f), the questions presented herein are legal, and it is not apparent how additional discovery would advance Plaintiff's case."); Borskey v. Medtronics, Inc., No. CIV.A. 94-2302, 1994 WL 585676, at *1 (E.D. La. Oct. 24, 1994) (granting a motion for summary judgment "based solely on the legal issue of whether plaintiffs' state-law claims are preempted by federal law," because "[t]his is a purely legal question raising no factual issues and requiring no discovery whatsoever").

gathered informally, may always substitute for formal discovery.  Rather, we are suggesting that, as a matter of fact, Ms. Brown has not been deprived of the right to present relevant and material evidence to this Court in attempting to rebut the City's motion.

Finally, the all-encompassing point here is that Ms. Brown has failed to articulate an issue of fact which may be clarified through discovery, and which will "assist [her] in opposing summary judgment."  See Krim, 989 F.2d at 1442.  Put simply, none of the purported fact issues presented by Ms. Brown are material to our decision, as we will discuss more fully below.  Therefore, Ms. Brown is not entitled to conduct discovery prior to our disposition of this motion.  We now proceed to address the narrow legal question presented by the City's motion.

     2.    *Mr. Johnson's Intent*

Ms. Brown contends that fact issues remain regarding Mr. Johnson's intent as expressed in the termination letter; specifically, whether Mr. Johnson intended to "preclude Ms. Brown's active participation in the [Cleco] case or to terminate her contract with the City altogether."  (Doc. 384-1, p. 13).  These alleged disputes are relevant, according to Ms. Brown, because (1) the issue of whether the Contract was terminated is central to certain aspects of the City's Rule 12(b)(6) Motion to Dismiss Intervenor's Tortious Interference with Contract Claims (Doc. 158)[9]; and (2) the issue presented by this motion regarding Mr. Johnson's authority to terminate the Contract

---

[9]  The Court recently granted the City's motion and dismissed Ms. Brown's tortious interference claim (Doc. 433), rendering this argument moot.

is intertwined with the intent of his letter.  In support of her position, Ms. Brown cites to the language of the termination letter and subsequent statements by Mayor Roy. After reviewing the evidence, we do not find a genuine issue of material fact as to Mr. Johnson's intent to terminate Ms. Brown from the Cleco litigation.

There is only one agreement at issue in this litigation, and that agreement specifically provided that the City "employs and retains [Ms. Brown] to represent it in all claims related to any and all transactions and/or any and all other relationships [the City] has or had with Cleco . . . along with any and all other parties who may be liable to the Client" for any claims related to the Cleco litigation.  (Doc. 77-1, Exh. 1 p.1).  The Contract specified that the "Claims" to which it referred "involve overcharges by [any parties referenced above], and unpaid amounts owed by [those parties] to [the City] in any way related to electric power or transmission agreements."  (Doc. 77-1, Exh. 1, p. 1).  Although this language is inclusive, the nature and scope of the retention is clear: under the Contract, Ms. Brown was retained only to represent the City in the Cleco litigation.

That fact having been established, we find it beyond question that Mr. Johnson intended to, and in fact did, terminate Ms. Brown's representation of the City in the Cleco litigation, thereby terminating the Contract.  His intent could scarcely be more clear in the termination letter: "Please be advised that, pursuant to Section 4-02 of the City Charter, I am terminating your participation in the representation of the City of Alexandria in [the Cleco] case."  (Doc. 77-1, Exh. 2, p. 1).

13

Later in the termination letter, Mr. Johnson explained why Ms. Brown's actions "constitute[d] the need for dismissal." (Doc. 77-1, Exh. 2, p. 2). Finally, Mr. Johnson requested that Ms. Brown return the case file, "refrain from any representation, further contract, or communication regarding this case," and submit a "detailed itemization of [her] work in the case." (Doc. 77-1, Exh. 2, pp. 2-3). These statements unambiguously express Mr. Johnson's intent to terminate Ms. Brown's Contract.[10] Subsequently, Ms. Brown was removed as counsel of record in the case. (Doc. 88).

As we will discuss more fully below, Mr. Johnson was entitled to terminate Ms. Brown's representation of the City under the Contract, as well as under Louisiana law and the Charter. Despite that fact, Ms. Brown maintains that subsequent actions on Mayor Roy's and Mr. Johnson's part draw into question Mr. Johnson's intent in the termination letter. Ms. Brown relies upon video excerpts from two City Council meetings in which Mayor Roy and Mr. Johnson made equivocal, and arguably contrary, statements regarding the status of Ms. Brown's Contract.[11] These brief

---

[10] Ms. Brown argues that the following sentence in the termination letter creates some ambiguity: "I will consider your failure to comply with these demands as a violation of your legal agreement with the City." (Doc. 77-1, Exh. 2, p. 3). According to Ms. Brown, this sentence presumes that the Contract remained in effect. However, Mr. Johnson may have meant that Ms. Brown, by refusing to return the file and cease her representation, would violate the portion of the Contract specifying that the Ms. Brown's representation was terminable at the City's will. Furthermore, this sentence does not even refer to Ms. Brown's Contract by name – Mr. Johnson may have been referring to another legal agreement, incident to Ms. Brown's contract, requiring Ms. Brown to return the case file and cease communications regarding the case upon her termination. In any case, no interpretation of this sentence would leave the Contract in force, or would alter the intent of the termination letter: to end Ms. Brown's representation of the City in the Cleco case under the Contract.

[11] Specifically, at a June 12, 2007 City Council meeting, both Mayor Roy and Mr. Johnson made statements to the effect that no one had informed Ms. Brown that her contract was "null and void." (Doc. 178, Exh. G).

14

excerpts, the precise contexts and meanings of which are undeterminable, in no way alter Mr. Johnson's position in the termination letter.  While both Mayor Roy and Mr. Johnson made statements during the June 12, 2007 to the effect that no one had informed Ms. Brown that her contract was "null and void" or "severed," both also made clear that Ms. Brown's representation of the City in the Cleco litigation had been terminated.  Moreover, during the January 9, 2009 City Council meeting, Mr. Johnson made clear that Ms. Brown had been terminated, and even went so far as to explain the possible bases upon which Ms. Brown could seek recovery of any fees that she may have earned in light of her termination.  This evidence does not create a genuine issue of material fact as to Mr. Johnson's intent.[12]

Indeed, even accepting Ms. Brown's best position, and accepting the "null and void" and "severed" language as Ms. Brown interprets it, she is nonetheless entitled to no relief.  These statements can easily be reconciled, because Ms. Brown's contract is not "null and void" or "severed."  To the contrary, we are here now litigating the potential rights that Ms. Brown still has to attorney's fees.  Any such rights arose from the Contract.  Thus, although Mr. Johnson terminated Ms. Brown's Contract, neither he nor Mayor Roy declared that the Contract was "null and void" or

---

[12] Even if Mayor Roy and Mr. Johnson actually meant to imply, for whatever reason, that Ms. Brown's Contract had not been terminated, these erroneous statements do not retroactively alter the facts.  Ms. Brown's Contract pertained only to the Cleco litigation.  Neither Mayor Roy nor Mr. Johnson *ever implied* that Ms. Brown still represented the City in that litigation.  As such, the Contract was terminated, as a matter of fact, rather than accusation or speculation.

15

"severed."[13]

Next, Ms. Brown submitted her own affidavit, in which she claims that an "emissary" from Mayor Roy told her that if she sent a "letter of resignation," reflecting that she wanted to terminate the Contract, then she would "receive work from the City." (Doc. 182, p. 7). Even assuming this event occurred, such an indirect contact, after the fact of her termination, is irrelevant to the question before the Court. The message also has no bearing whatsoever on the intent or effect of Mr. Johnson's letter. For that matter, we cannot be certain that this message implies anything about Mayor Roy's intent, as it was purportedly communicated indirectly.

Nonetheless, interpreting these facts in a light most favorable to Ms. Brown, we note that Mr. Johnson, not Mayor Roy, wrote the termination letter, and Mr. Johnson's intent is necessarily controlled by the terms of the termination letter itself. We reach this conclusion regardless of whether Mayor Roy's or Mr. Johnson's statements may fairly be characterized in the manner suggested by Ms. Brown. Therefore, we find that any factual dispute presented by this evidence is immaterial to our decision herein.

3.   _Mayor Roy's Potential Involvement in Ms. Brown's Termination_

Ms. Brown claims that the City has presented no definitive evidence of what Mayor Roy's role in her termination may have been. Under the evidence presently

---

[13] To avoid confusion, we reiterate that the Contract only applied to Ms. Brown's representation of the City in the Cleco litigation. Therefore, by terminating that representation, Mr. Johnson effectively terminated the Contract. But in doing so, Mr. Johnson did not "nullify" or "sever" the Contract – as previously noted, the Contract itself provided for termination of the representation.

16

available, however, Ms. Brown suggests that Mayor Roy was the actual decision maker.  According to Ms. Brown's affidavit, Mr. Johnson told Ms. Brown and others that Mayor Roy was acting as city attorney in the Cleco litigation, and had forbidden Mr. Johnson from getting involved in the case.  (Doc. 182, p. 8).  This is relevant, Ms. Brown argues, because under the conflict of interest provision of the Charter, Mayor Roy was not permitted to be involved with the Cleco case.

Section 7-02 of the Charter states that "[a]ny city officer or employee who has a substantial financial interest, direct or indirect . . . in any contract with the city . . . shall be prohibited from voting or otherwise participating in his capacity as a city officer or employee . . . in the making or performance of such contract."  (Doc. 178-2, Exh. B).  Ms. Brown contends that Mayor Roy had such an interest in the Cleco litigation, because as a private attorney (and before he was elected to public office), Mayor Roy represented clients with a financial interest in the outcome of the litigation.  Therefore, Ms. Brown claims that Mayor Roy would profit substantially by eliminating attorneys with a contingency interest in the Cleco litigation, such as herself.

At present, there is scant indication in the record (drawn from Ms. Brown's own affidavit) that Mayor Roy may have represented private clients with an interest in the Cleco settlement.  The Court has not been convincingly apprised, through evidence or otherwise, of whether Mayor Roy divested himself of these interests.  We do note that, at least up to this point, the City has not offered evidence to refute Ms. Brown's accusations regarding Mayor Roy's private interests, or their bearing upon

his capacity to act in this litigation.

However, it is not necessary at this juncture for us to make a determination of whether Mayor Roy's potential conflict of interest was even relevant.  Under any combination or interpretation of these facts, the magistrate judge has correctly analyzed the narrow issue presented by the City's motion: Mr. Johnson's authority under the Charter to discharge Ms. Brown.  That she was validly terminated is crystal clear on the record before us, as we will discuss below.  By whom is likewise beyond contest: Mr. Johnson authored, signed, and transmitted the correspondence effecting Ms. Brown's termination.  Whether Mayor Roy influenced, pressured, or ordered Mr. Johnson to do so has no bearing upon whether Mr. Johnson had the authority to, and effectively did, terminate Ms. Brown.

As such, while the issues regarding Mayor Roy's private financial interests may impact our determination of whether Ms. Brown was terminated for cause, they do not impact our decision on the City's motion.  Therefore, we do not rule here as to the merit of Ms. Brown's arguments.  Any remaining factual questions as to Mayor Roy's financial interests are not material herein, and do not preclude a rendering of partial summary judgment.

We are thus left with to decide the issues regarding the nature and effects of Ms. Brown's termination.  Some discovery may be appropriate in order to determine whether Ms. Brown was terminated with or without cause, and therefore, the amount of monetary relief to which she is entitled.  Any such discovery will be supervised by the Court, after the filing of appropriate motions by the parties.  For purposes of this

motion, however, to repeat, none of the issues presented by Ms. Brown are material to our determination herein.

### C.    Mr. Johnson's Authority to Terminate Ms. Brown's Contract

As we have already concluded, Mr. Johnson had the authority to terminate Ms. Brown's contract.  More explanation is necessary.  The parties' arguments regarding this question are diametrically opposed.  Ms. Brown contends that "[a]s a matter of law, the City's argument contradicts not only the Charter, which vests authority for retaining special legal counsel with the City Council, but also Louisiana jurisprudence holding that members of the executive branch may not terminate or even modify contracts authorized by a city council."  (Doc. 384-1, p. 18).  The City interprets the Charter as placing special legal counsel under the city attorney's authority and supervision, and distinguishes the jurisprudence cited by Ms. Brown which purportedly narrows the authority of the City's executive branch.

### 1.    *The Charter, the Ordinance, and the Contract*

The most appropriate starting point in our analysis is the Charter itself.  As the magistrate judge noted, the Louisiana First Circuit Court of Appeal in <u>Breaux v. Lafourche Parish Council</u> ably summarized the rules governing a court's interpretation of municipal charters:

> Statutory rules of construction of laws are as applicable to municipal and parish ordinances as they are to state statutes. When a law is clear and free from ambiguity its letter is not to be disregarded under the pretext of pursuing its spirit. The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words. When a law is clear and free from all ambiguity, it must be given

19

effect as written. Every word in a statute must be given meaning, if possible; no word, clause, phrase or sentence of a statute shall be deemed meaningless or surplusage if a construction can be legitimately found which will give force to and preserve every word of the statute. In construing a statute, legislative aim and design may be inquired into by the courts for the purpose of determining legislative intent, only when a statute is ambiguous or subject to two reasonable interpretations.

851 So. 2d 1173, 1176-77 (La. App. 1st Cir. 2003) (quoting La. Television Broad. Corp. v. Total C.A.T.V., 341 So. 2d 1183, 1185 (La. App. 1st Cir. 1977) (internal citations omitted)).

The relative authority of three municipal posts is at issue: the City Council, the mayor, and the city attorney.  First, as to the City Council, Section 2-06 of the Charter provides as follows: "All powers of the city shall be vested in the council, except as otherwise provided by law or this charter, and the council shall provide for the exercise thereof and for the performance of all duties and obligations imposed on the city by law." (Doc. 178-2, Exh. B, § 2-06).  This sweeping grant of authority is modified by Section 2-12, which lists acts of the City Council which must be consummated by ordinance, "[i]n addition to other acts required by law or by specific provision of this charter to be done by ordinance." (Doc. 178-2, Exh. B, § 2-12).  Among those acts which require an ordinance is the authorization of "any contract on behalf of the city." (Doc. 178-2, Exh. B, § 2-12(16)).

Pursuant to this authority, the City Council *authorized* (but did not seek to *compel*) former Mayor Randolph to enter into a legal services contract with Ms. Brown. (Doc. 77-1, Exh. 3).  The ordinance was passed *at the request of the City administration*, as reflected in its text: "WHEREAS, the City desires to have contract

20

attorneys to assist the City Attorney with legal matters which may arise *from time to time* on behalf of the City." (Doc. 77-1, Exh. 3, p. 1) (emphasis added).

As the magistrate judge noted, Mayor Randolph was not obligated to hire Ms. Brown, and could have independently refused to do so. Therefore, the Ordinance merely *vested Mayor Randolph with the authority* to enter into the Contract; it was not a mandate of any kind. Pursuant to Section 3-01 of the Charter, the mayor serves as the "chief executive officer of the city," and "[a]ll executive and administrative authority shall be exercised by and through the mayor except as set forth in this chapter." (Doc. 178-2, Exh. B, § 3-01). Thus, as an exercise of this authority, and with the approval of the City Council, Mayor Randolph executed the Contract retaining Ms. Brown to represent the City in the Cleco litigation.

Once Ms. Brown was retained by the City, her employment became subject to Article IV of the Charter governing city administration. This article subdivides and compartmentalizes municipal authority. Section 4-01 begins by noting that "[a]ll division, departments, offices, and agencies shall be under the direction and supervision of the mayor." (Doc. 178-2, Exh. B, § 4-01(A)). Pursuant to Section 4-02, the following provisions apply to the City's Legal Division:

(A)     The head of the legal division shall be the city attorney who shall be appointed by the mayor, subject to confirmation by the council, and shall serve at the pleasure of the mayor. He shall be an attorney licensed to practice in the courts of Louisiana with at least five (5) years' experience in the practice of law.

(B)     The city attorney shall serve as chief legal adviser to the mayor, city council and all divisions or departments, offices and agencies, shall represent the city in all legal proceedings and shall perform any other duties prescribed by this charter or by

21

ordinance.

(C)     *Any assistant city attorneys authorized by the city council shall*
        *be appointed by the city attorney and serve at his pleasure.*

(D)     *No special legal counsel shall be employed by the city except by*
        *written contract and approval of the city council.*

(Doc. 178-2, Exh. B, § 4-02) (emphasis added).  It is clear, and both parties agree, that

Ms. Brown was hired as special legal counsel under Subsection (D).  The question

becomes, then, whether Mr. Johnson has the authority to unilaterally terminate

special legal counsel without a city ordinance authorizing him to do so.

Ms. Brown argues that the differentiation between assistant city attorneys and

special legal counsel in the Charter bears emphasis.  Subsection (C) authorizes the

city attorney to appoint assistant city attorneys, who thereby serve at his pleasure.

By contrast, Subsection (D) requires the approval of the City Council to hire special

legal counsel, and does not state that special legal counsel serve at the pleasure of

the city attorney.  Read in a vacuum, Subsection (D) fails to specify that the city

attorney has any authority over special legal counsel.  Nonetheless, we find such a

vacuous reading to be untenable for a number of reasons.

First, as the Charter is written and organized, special legal counsel are

members of the City's legal division.  Subsection (D) is merely one of four subsections

falling under Section 4-02, which is titled "Legal Division."  This placement strongly

indicates that special legal counsel are, at a minimum, subject to the supervisory

authority of the city attorney, who is "[t]he head of the legal division."  (Doc. 178-2,

Exh. B, § 4-02(A)).  The city attorney is also obligated to "represent the city in all legal

22

proceedings," meaning that Mr. Johnson was the City's representative in the Cleco litigation.  If special legal counsel like Ms. Brown were to operate devoid of any obligation to the city attorney, and subject in no way to his authority, then these provisions making the city attorney the head of the legal department, and making special legal counsel members of the legal department, would be rendered meaningless.  We refuse to retroactively nullify this language in the Charter, and to strip the city attorney of his supervisory authority as head of the legal division.[14]

Indeed, to read the Charter otherwise would create an internal disjunction among its provisions.  While the Charter requires the approval of the City Council for the execution of any contract, including, specifically, a contract retaining special legal counsel, it also vests the executive branch with supervisory authority over administrative divisions.  The city attorney is an executive appointee, supervised by the mayor, and with supervisory powers over the entire legal division.  It cannot be denied that special legal counsel operate only as members of the legal division.  By default, then, special legal counsel operate under the supervisory authority of the city attorney.  This Court is bound "to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions."  Breaux, 851 So. 2d at

---

[14] We also reject the implication of Ms. Brown's argument that, because the Charter requires the approval of the City Council to hire special legal counsel, the Charter therefore vests plenary authority in the City Council to exercise administrative control over attorneys contracted by the City. The Charter requires the City Council's approval of the city attorney's decision to appoint an assistant city attorney under Section 4-02(C) as well.  Yet, neither party has argued that the city attorney lacks the authority to supervise, and terminate, an assistant city attorney, simply because the approval of the City Council is required.  We surmise, as discussed further below, that Ms. Brown relies heavily upon the inclusion of the language specifying that assistant city attorneys "serve at the pleasure" of the city attorney in interpreting the Charter as she does.  We will address that language in due course.

23

1177 (citing <u>Bunch v. Town of St. Francisville</u>, 446 So. 2d 1357, 1360 (La. App. 1st Cir. 1984)); <u>see also</u> <u>Waste Mgmt. of Cent. La. v. Beall</u>, 880 So. 2d 923, 930 (La. App. 3d Cir. 2004) (" Laws are to be construed as having the meaning that best conforms to the purpose of the law.") (citing La. Civ. C. art. 10).  The only interpretation which harmonizes the provisions vesting the city attorney with supervisory authority, and placing special legal counsel within the ambit of the legal division, is one recognizing the city attorney's authority to supervise, and terminate, special legal counsel.

Second, the language of the Ordinance authorizing the mayor to hire Ms. Brown supports this interpretation.  The City Council adopted the Ordinance, at least ostensibly, because "the City desire[d] to have contract attorneys *to assist the City Attorney* with legal matters."  (Doc. 77-1, Exh. 3, p. 1).  Therefore, it was unquestionably within the contemplation of the members of the City Council that Ms. Brown would be assisting, and would be subject to the authority of, the city attorney. Moreover, the Charter specifies that the city attorney "shall represent the city in all legal proceedings and shall perform any other duties prescribed by this charter or by ordinance."  (Doc. 178-2, Exh. B, § 4-02(B)).  Read in concert, the Charter and the Ordinance fairly support the City's suggested interpretation.

Third, Ms. Brown's contract makes no reference to the City Council.  The Contract does, however, specify that it is terminable at will.  Neither the City Council as a body, nor any of its members individually, were parties to the Contract. Moreover, the Contract does not suggest that Ms. Brown's prospective termination would be subject to approval by the City Council.  Rather, the Contract mentions only

24

two parties: the City and Ms. Brown.  The City, as the "Client," implicitly reserved the right to terminate the Contract.  Thereafter, Ms. Brown retained the right to intervene in the principal litigation (as she did) to pursue any fee to which she may be entitled (which she is doing).  Thus, the terms of the Contract do not support the interpretation of the Charter proposed by Ms. Brown.

Finally, Ms. Brown emphasizes that certain language *does not appear* in the relevant Charter provisions.  Specifically, Ms. Brown notes that Section 4-02(D) does not state that special counsel serve at the pleasure of the city attorney, while Section 4-02(C) states that assistant city attorneys will be appointed by the city attorney and serve at his pleasure.  That observation is beyond reproach.  From it, Ms. Brown has suggested that the magistrate judge treated the absence of this language in Subsection (D) as a "mere oversight" or a "meaningless curiosity."  (Doc. 384-1, p. 19).

We disagree with that characterization of the magistrate judge's ruling, and we do not ascribe the talismanic significance to this language that Ms. Brown to advocates.  Instead, the magistrate judge focused, as this Court does, upon the placement of Subsection (D) within Section 4-02.  We emphasize the structure and consistency of the document as a whole, rather than the inclusion or exclusion of a single phrase in the Charter.  The language stating that assistant city attorneys serve at the pleasure of the city attorney relates to their status as appointed employees.  The same language, for instance, applies to the city attorney himself, who is appointed by the mayor and serves at the mayor's pleasure.  We see no reason, in the

25

text of the Charter or otherwise, to find that the Charter reflects this language in order to find that Mr. Johnson had authority to terminate Ms. Brown.[15]

Moreover, if we were to consider hypothetical language not included in the Charter, we would have to consider other relevant omissions.  For instance, Section 4-02(D) does not specify that an ordinance is required to terminate special legal counsel.  That section also does not imply that special legal counsel are in any way exempt from the city attorney's broad supervisory authority over the legal division. Likewise, conspicuously absent from Section 2-12 is any requirement that the City Council approve the termination of a contract with the City, particularly one authorizing the mayor to retain special legal counsel.  Rather, Section 2-12 requires an ordinance to *authorize*, not *terminate*, "any contract on behalf of the city."  (Doc. 178-2, Exh. B, § 2-12(16)).  These rather glaring absent provisions in the Charter militate strongly in favor of an interpretation vesting the city attorney with the authority to terminate Ms. Brown's Contract.

In all, we give the provisions of the Charter their most logical, internally consistent, and ordinary meaning.  Relying upon the terms of the Charter, and drawing the most reasonable inferences from the other pertinent documents in the

---

[15] The logical effect of Ms. Brown's interpretation is to drastically, and unnecessarily, expand the City Council's stated function: to approve the execution of contracts on the City's behalf as a legislative body.  Instead, Ms. Brown suggests that the City Council also maintains ultimate administrative authority over special legal counsel.  That idea runs contrary to the delegation of authority to the mayor and the various municipal divisions which pervades Article IV of the Charter. Furthermore, Ms. Brown's interpretation sanctions the idea that a legislative body may exercise final control over the decision of whether to terminate an attorney practicing law on behalf of the City.  The more logical reading of the Charter is that the city attorney, as a practicing attorney, the City's chief legal adviser, and the City's default representative in all legal matters, should exercise such managerial control over attorneys contracted by the City.

26

case, we find that Mr. Johnson had the authority under the Charter to terminate Ms. Brown's Contract, and thereby, her representation of the City in the Cleco litigation. Furthermore, we find that Mr. Johnson did so in his February 28, 2007 termination letter.

### 2.   *The Jurisprudence*

The jurisprudence cited by Ms. Brown does not alter our considerations and conclusions above.  She relies upon the Louisiana Third Circuit court's decision in Roy v. Humphries, a case in which the city attorney brought an action seeking a Writ of Quo Warranto against an attorney acting as special counsel to the city council in litigation against the mayor. 445 So. 2d 130, 130 (La. App. 3d Cir. 1984).  The mayor had refused to honor an electrical power sales contract secured by the former mayor, prompting the city council to declare an "extreme public emergency."  Id. at 131.  By ordinance, the city council retained special counsel, who then filed a mandamus suit against the mayor to secure his compliance with the contract.  Id. at 131-32.  The city attorney thereafter filed a separate action to compel special counsel to establish his authority to act on behalf of the City Council.  See id. at 132.

The court held that the City Council faced an "extreme necessity" which warranted the retention of special counsel under La. R.S. § 33:1813.[16]  Id. at 133. However, this case is distinguishable on a number of grounds.  First, unlike Ms. Brown, special counsel in Roy was retained to represent the City Council, rather than

---

[16]  Under this statute, "[a] municipality may employ, fix the compensation for, and pay additional counsel in cases of extreme necessity."  La. R.S. § 33:1813.

the City.  The lawsuit in <u>Roy</u> was a mandamus action against the mayor, pitting the executive branch against the legislative branch.  Here, however, the City Council was and is not a party to the principal litigation nor Ms. Brown's intervention.  Therefore, <u>Roy</u> is inapposite to the questions presented by the City's motion.

Ms. Brown next cites <u>Smith v. City of Alexandria</u>, a case in which the mayor of Alexandria issued an executive order reducing the work week of municipal employees from forty to thirty-two hours per week.  420 So. 2d 1329, 1330 (La. App. 3d Cir. 1982).  The mayor justified his action by stating that it was necessary to reduce city expenditures in the face of declining utility revenues.  <u>See id.</u>  Municipal employees filed suit against the city and the mayor, seeking to enjoin enforcement of the executive order.  <u>Id.</u>  Among the questions analyzed by the court was whether the mayor had the authority to "unilaterally alter or void the labor contract between the City and its employees."  <u>Id.</u>

The court ultimately held that "the Mayor is not authorized to take remedial actions altering, or voiding city employees' labor contracts," and that "the City Council [was] the authorative [sic] body for entering into labor contracts with the city employees."  <u>Id.</u> at 1331.  In recognizing the city council's authority, the court relied upon the following provision of the charter: "Final approval of any labor contracts with municipal employees shall rest with the City Council."  <u>Id.</u>

While this opinion seems to equate the city council's power to approve contracts with its power to alter or void contracts, a number of other provisions are important.  Section 5-05 of the charter, the source of authority claimed by the mayor in

28

Smith, required the mayor to present his recommendations for remedial measures to the city council.  This provision thus specifically limited the mayor's power to issue executive orders seeking to curb a budget deficit.  Also, Section 7-04 of the Charter limits the mayor's role in the promulgation of labor contracts to acting as the City's representative in negotiations with union representatives.  Unlike the circumstances of this case involving the city attorney, there was no provision in Smith which could have been construed as extending the mayor's province beyond that role.  Most importantly, however, Section 7-04 of the Charter falls within Article VII, which is titled "General Provisions."  The circumstances of the case did not compel the court to consider a focused delegation of authority to a divisional head under Article IV, or in particular, the city attorney's role in supervising the legal division.

The Louisiana Second Circuit court's decision in Sunray Services, Inc. v. City of Minden suffers from many of the same deficiencies.  690 So. 2d 970 (La. App. 2d Cir. 1997).  In that case, the city entered into a contract granting a garbage collection company the exclusive right to collect commercial and industrial garbage in the city. Id. at 971.  The city council later approved a seven-year extension of the contract, but the mayor vetoed this extension as contrary to Louisiana statutory law.  Id. at 972. Then, the mayor informed the owner of the garbage collection company of the city's intent to terminate the contract, without the city council's approval.  Id.  The garbage collection company filed suit alleging breach of contract.  Id.

In its ruling, the court first noted that, "[a]s a general rule, a mayor acting alone is without power to execute a contract binding on the city in the absence of an

29

ordinance or resolution by the governing council authorizing him to do so." Id. at 973. However, the court held that the garbage collection company was not entitled to damages, because the city council had tacitly ratified the mayor's termination of the contract. See id. at 973-74. As applied to this case, the opinion contains no discussion of a city charter, the power of an administrative appointee with supervisory authority to terminate a contract employee, or special legal counsel. Instead, the opinion relies upon the general rule (which is conceded in this case) that city council approval is required for the execution of contracts on behalf of municipalities. See id. at 973. Thus, the opinion lacks any discussion of the very exception to the general rule which is at issue in this case.

The fact that none of these cases focus upon a municipality's legal (or any other administrative) division is highly significant.[17] As we have noted in a previous ruling, legal contracts are to an extent *sui generis*, and are generally terminable at the will of the client prior to the completion of the representation.[18] Early termination by the client does not necessarily deprive the attorney of all rights to recover under the

---

[17] One of Ms. Brown's chief criticisms of the City's position is that it has not cited a case directly on point which supports it. We note here that Ms. Brown has likewise failed to do so regarding her interpretation of the Charter.

[18] See, e.g., *In re Jones*, 859 So. 2d 666, 670 (La. 2003) ("It is well settled that a client has an absolute right to discharge his or her lawyer at any time."); Doles v. Cent. Boat Rentals, Inc., No. 2006 CA 0304, 2006 WL 3813700, at *2 (La. App. 1st Cir. Dec. 28, 2006) ("Even when a client is obligated by a contract, the client has a right to discharge the attorney (and terminate the contract) at any time, with or without cause, subject to liability for payment for reasonable attorneys' fees.") (citing Scott v. Kemper Ins. Co., 377 So. 2d 66, 70 (La. 1979)) .

contract.[19]  The cases above do not take these factors into consideration, and therefore, are not controlling in our decision.

In sum, unlike the cases cited by Ms. Brown, this situation involves (1) the authority of an executive appointee (2) with supervisory authority over an administrative division (3) who acts as the City's default representative in all legal proceedings, and (4) who terminated a contract attorney retained with the City Council's approval, but subject to his supervisory authority and retained to assist him on one particular piece of litigation in which the City, not the City Council, was a party.  These distinctions are pivotal to the legal question presented by the City's motion.  Nothing in the jurisprudence cited by either party (or uncovered by this Court) addresses these circumstances in particular, or convinces us that our conclusion should be altered in any respect.  Accordingly, the City is entitled to partial summary judgment as to the narrow legal conclusion that Mr. Johnson had the authority to, and in fact did, terminate Ms. Brown's representation of the City in the Cleco litigation under the Contract.

III.   **Conclusion**

The Court is aware that there is no crystalline statement in the Charter which removes all doubt from the interpretation that we adopt today.  However, the Court is also convinced that no provision of the Charter, no term of the Contract or the

---

[19]  See, e.g., Francis v. Hotard, 798 So. 2d 982, 985 (La. App. 1st Cir. 2001) (explaining that, although a client may terminate an attorney's contract at any time, the attorney may nonetheless be entitled to payment of "reasonable attorney's fees"); see also O'Rourke v. Cairns, 683 So. 2d 697, 704 (La. 1996) (describing the methods of computing attorney's fees when a client prematurely terminates a contingency fee contract).

Ordinance, and no rule in Louisiana law warrants a different interpretation.  Ms. Brown was contracted by the City, not the City Council.  She was supervised by the head of the City's legal division, Mr. Johnson.  Ms. Brown's contingency fee contract was terminable not only by default principles of Louisiana law, but also by its own terms.  Mr. Johnson exercised ultimate administrative authority as head of the Legal Division, which is granted him under the Charter, and terminated Ms. Brown.  Those are the facts of this case, and at this point, we need only decide the amount of compensation to which Ms. Brown may be entitled, if any.  Her right to proceed toward that sole, remaining, quest is preserved.[20]

SIGNED on this 17 day of August, 2010 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE

---

[20]  See O'Rourke, 683 So. 2d at 704 (holding that "'[t]he amount prescribed in the contingency fee contract, *not quantum meruit*, is the proper frame of reference for fixing compensation for the attorney prematurely discharged *without cause*,'" but that, "in cases of discharge with cause of an attorney retained on contingency, the trial court should determine the amount of the fee according to the Saucier rule, calculating the highest ethical contingency to which the client contractually agreed in any of the contingency fee contracts executed. The court should then allocate the fee between or among discharged and subsequent counsel based upon the Saucier factors. Thereafter, the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the Saucier allocation.") (quoting Saucier v. Hayes Dairy Products, Inc., 373 So. 2d 102, 118 (La. 1979)).

32