RECEIVED
JUL 19 2012
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| CITY OF ALEXANDRIA | CIVIL ACTION NO. 05-1121 |
| -vs- | JUDGE DRELL |
| CLECO CORPORATION, et al. | MAGISTRATE JUDGE KIRK |

## REASONS FOR JUDGMENT

I. **Background**

The parties to the main demand in this litigation confected a settlement after more than four years of litigation. By Judgment of Dismissal dated February 24, 2010 (Doc. 379), the Court dismissed the City of Alexandria's ("City's") claims against Cleco Corp. et al. ("Cleco") with prejudice. During the course of the litigation, the City's three former attorneys sought attorney's fees for work they claim to have done, and pursuant to contingency fee contracts confected with the City near the front end of the case. Given the nature of the proceedings and the law for attorney's fees in such situations, we conducted a trial as to the attorney's fee claims on June 29-30, August 26, and 29-31, 2011. The parties have submitted proposed findings of fact and conclusions of law after an extended briefing period, and the attorney's fee claims are ripe for decision.

For the reasons set forth below, this Court will render judgment as follows: in favor of John M. Sharp and against the City of Alexandria in the amount of $700,000.00 plus legal interest from the date of judgment[1] and costs as provided by law; and in favor

---

[1] See McCarty Corp. v. Pullman-Kellogg, Div. of Pullman, Inc., 751 F.2d 750, 762 (5th Cir. 1985).

of H. Craig Davidson, Jr. and against the City of Alexandria in the amount of $1,300,000.00 plus legal interest from the date of judgment and costs as provided by law. All remaining claims will be DISMISSED with prejudice.

### A. Bridgett Brown

The most contentious of the fee claims has been that of attorney Bridgett Brown ("Ms. Brown"). Pursuant to authority granted to then-Mayor Edward G. Randolph, Jr. by a City Ordinance (Claimants' Joint Exh. 7), Ms. Brown was retained by execution of a contingency fee contract (Claimants' Joint Exh. 239). The contract provided that, "[s]hould Client discharge Attorney for any reason, Client authorizes Attorney to initiate proceedings and/or intervene in any proceedings for fees, costs, advances, guarantees, and any other sums to which Attorney is entitled." (Id. at pp. 1-2). As compensation for her services, the contract granted Ms. Brown a contingency fee of "ten percent (10%) of the underlying amount recovered including judicial interest." (Id. at p. 2).

On February 28, 2007, Charles E. Johnson, Jr. ("Mr. Johnson"), City Attorney for Alexandria, issued a letter to Ms. Brown terminating her representation of the City in the Cleco litigation. (Claimants' Joint Exh. 244). Subsequently, on April 17, 2007, Ms. Brown filed a Petition for Intervention (Doc. 77), seeking to recover her attorney's fees upon resolution of the main demand. Since then, Ms. Brown has filed two amended complaints.[2]

---

[2] Ms. Brown's first amended complaint (Doc. 152) added various factual allegations, as well as two additional counts (for tortious interference of contract and defamation) and two additional defendants (Alexandria Mayor Jacques Roy and Mr. Johnson) to the lawsuit. The additional counts and defendants have since been dismissed from the lawsuit. (Docs. 433-35). Ms. Brown's second amended complaint (Doc. 199) contained further, more specific, factual allegations purporting to support Ms. Brown's tort claims.

At the time of settlement, two motions were pending before the Court related to Ms. Brown's intervention: a Rule 12(b)(6) Motion to Dismiss Intervenor's Tortious Interference with Contract Claims (Doc. 158), and a Motion for Partial Summary Judgment (Doc. 165).[3] The Court ultimately granted both motions (Docs. 432, 433, 434, 435, 440, 441), dismissing all of Ms. Brown's claims except for her claim to recover attorney's fees, and declaring that the City Attorney had the legal authority to terminate Ms. Brown's representation of the City (and thus, her Contract). The Court also denied (Doc. 443) a Motion to Segregate Funds (Doc. 403) filed by Ms. Brown, which motion sought an order from the Court compelling the City to set aside ten percent of any settlement values recovered from Cleco. As the Court stated in its ruling, "the time has come to determine whether Ms. Brown is entitled to recover under her now-terminated Contract, and if so, to calculate the proper amount of that recovery." (Doc. 443, p. 12).[4]

### B. The Other Attorneys

The other attorneys named in the Ordinance authorizing Mayor Randolph to retain special legal counsel were John M. Sharp, H. Craig Davidson, Jr., and Philip Hunter.[5] (Claimants' Joint Exh. 7). On June 14, 2010, the City filed a Third Party Complaint and Request for Declaratory Judgment regarding its attorney's fee dispute

---

[3] Magistrate Judge C. Michael Hill issued two report and recommendations (Docs. 382, 383) suggesting that the Court grant both of the City's motions.

[4] On July 2, 2010, the Court granted a Motion to Lift Stay on Discovery (Doc. 415) filed by Ms. Brown. (Doc. 423). The City consented to the motion. (Doc. 420). In this order, the Court noted that "[a]ny issues regarding the scope of discovery may be raised by other motion." (Doc. 423).

[5] Mr. Hunter withdrew as counsel of record relatively early in the underlying litigation and has not asserted a claim for attorney's fees. (Docs. 30, 31).

with Mr. Sharp and Mr. Davidson. (Doc. 413). Both attorneys are named as Third-Party Defendants in the Complaint, and both attorneys executed the **same** contingency fee contract, which is largely identical to Ms. Brown's Contract. (Doc. 413).[6] The original proposed fee was later amended to an agreed total contingency compensation of 20% of the underlying amount received.

The City claims that this contract was executed before the Ordinance took effect, and thus, "the Contract is void *ab initio*." (Doc. 413, p. 3). Moreover, because payment under the contract was "dependent upon [any] 'recovery, settlement and/or damages related to' [the claims]" (Doc. 413, pp. 4-5), the City argues that the contract was effectively dissolved, as neither attorney completed litigation of the suit through settlement. Finally, because both attorneys have made demands to the City for payment of fees under the contract, the City avers that issuance of a declaratory judgment under 28 U.S.C. § 2201 is appropriate.[7] The City further contends the contract had been dissolved under the following principles of law: (1) impossibility of performance; (2)

---

[6] The contingency fee provision of this contract provides as follows:

Client does hereby covenant and agree to pay Attorney, from the gross amount recovered from any settlement or award, a fee of twenty percent (20%) of the underlying amount recovered including judicial interest. Further, Client covenants and agrees to pay Attorney, (in addition to the 20% fee on the underlying basis value of the Claims), a sum equal to sixty percent (60%) of the total contingent fee of fifty percent (50%) of the recovery on any and all penalties, attorneys fees, exemplary and/or punitive damages, fines, and any other settlements and/or awards in excess of the underlying basis amount of the Claims found due, owing, or paid in settlement.

(Claimants' Joint Exh. 4, p. 2).

[7] Mr. Sharp has since been disbarred by order of the Louisiana Supreme Court. Prior to his disbarment, the City sent a letter terminating Mr. Sharp's contract (City of Alexandria Exh. 45). Again, the contract provided for services by both Mr. Sharp and Mr. Davidson. The City alleges neither attorney had conducted discovery or advanced the case.

4

failure of performance; and (3) termination of joint venture resulting from Mr. Sharp's disbarment. Regarding compensation, the City alleges that the attorneys are entitled to recover only under *quantum meruit*, and alternatively, even if the contract was not dissolved, payment of the full 20% contingency fee is unreasonable.

Thus, in sum, the City requests a declaratory judgment providing the following alternative or conjunctive declarations: (1) the contract was null *ab initio*; (2) the contract was terminated; (3) the contract was dissolved as a result of the impossibility of performance;[8] (4) the contract was dissolved as a result of the attorneys' failure to perform; (5) the joint venture was terminated, thus dissolving the contract; (6) the attorneys may only recover on a *quantum meruit* basis; (7) the attorneys may only recover reasonable fees; (8) the attorneys may not recover fees for defense of this action; and (9) the City is entitled to costs and all other equitable relief.

On August 16, 2010, Mr. Davidson filed an "Answer to Third Party Complaint and Request for Declaratory Judgment; Counterclaim." (Doc. 439). Mr. Davidson alleges that: (1) although joint in nature, the contract applied to him and Mr. Sharp independently; (2) his partnership or joint venture may have been continued as a sole proprietorship under La. Civ. Code art. 2828 following Mr. Sharp's disbarment; and (3) the City waived its right to, and is now estopped from, asserting rescission or termination, because Mr. Davidson was not informed that he was terminated, and because the City continued to act pursuant to the contract by reimbursing his costs and expenses.

---

[8] See La. Civ. Code art. 1876 ("When the entire performance owed by one party has become impossible because of a fortuitous event, the contract is dissolved.").

5

Mr. Davidson also asserted a counterclaim against the City and Cleco, arguing that his efforts were hampered, and his business damaged, because of political maneuvering involved in the litigation. He has argued he spent thousands of hours working on the Cleco litigation, his efforts were directly responsible for the settlement, and Mr. Sharp's withdrawal (because of disbarment) did not terminate Mr. Davidson's contract.[9] Nonetheless, the City has refused to abide by the terms of his contract. Therefore, Mr. Davidson seeks a declaratory judgment: (1) denying the City's claims; (2) declaring the City owes Mr. Davidson his full contingency fee, or a 10% contingency fee pursuant to *quantum meruit*, or a reasonable fee; (3) that the City and Cleco must pay the fee, because Mr. Davidson filed the contract, perfecting a lien on any settlement

---

[9] Under Louisiana law, it is well-settled that,

> In the absence of any agreement or custom to the contrary, attorneys engaged in a joint venture share equally in the profits, while attorneys employed severally receive the reasonable value of their services. In order for a joint venture to exist, the parties must consent to the formation of the venture, share in the losses as well as the profits of the venture, and exercise equal control over the enterprise.

Whalen v. Murphy, 943 So. 2d 504, 507 (La. App. 1st Cir. 2006) (internal citations omitted).

funds under La. R.S. § 37:218(A);[10] (4) awarding him fees, interest, and costs incurred in this action; and (5) awarding him other appropriate relief.

## II. Legal Standards

### A. Lodestar

The lodestar method of calculating reasonable attorney's fees has been summarized as follows:

> The calculation of attorney's fees involves a well-established process. First, the court calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir.1995). The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case. Id. In making a lodestar adjustment the court should look to twelve factors, known as the Johnson factors, after Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). The factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability"

---

[10] The statute provides:

> By written contract signed by his client, an attorney at law may acquire as his fee an interest in the subject matter of a suit, proposed suit, or claim in the assertion, prosecution, or defense of which he is employed, whether the claim or suit be for money or for property. Such interest shall be a special privilege to take rank as a first privilege thereon, superior to all other privileges and security interests under Chapter 9 of the Louisiana Commercial laws. In such contract, it may be stipulated that neither the attorney nor the client may, without the written consent of the other, settle, compromise, release, discontinue, or otherwise dispose of the suit or claim. Either party to the contract may, at any time, file and record it with the clerk of court in the parish in which the suit is pending or is to be brought or with the clerk of court in the parish of the client's domicile. After such filing, any settlement, compromise, discontinuance, or other disposition made of the suit or claim by either the attorney or the client, without the written consent of the other, is null and void and the suit or claim shall be proceeded with as if no such settlement, compromise, discontinuance, or other disposition has been made.

La. R.S. § 37:218(A).

of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Id. at 717-19.

Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998). The lodestar method is "presumed to yield a reasonable fee." Smith v. State Farm Fire and Cas. Ins. Co., No. 09-6522, 2010 WL 3021641, at *1 (E.D. La. July 29, 2010).

However, the Supreme Court has held, "[c]ourts that approach fee determinations by looking first to the contingent-fee agreement, then testing it for reasonableness, have appropriately reduced the attorney's recovery based on the character of the representation and the results the representative achieved." Gisbrecht v. Barnhart, 535 U.S. 789, 808 (2002). Although somewhat unclear, this opinion seems to suggest that the contingency fee agreement, rather than the lodestar calculation, is the appropriate starting point in our analysis. Nonetheless, the Gisbrecht Court also held that "the court may require the claimant's attorney to submit, not as a basis for satellite litigation, but as an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement, a record of the hours spent representing the claimant and a statement of the lawyer's normal hourly billing charge for noncontingent-fee cases." Id.[11]

---

[11] In dissent, Justice Scalia took direct issue with the majority's instructions to district courts confronting attorney's fee disputes:

The Court tells the judge to commence his analysis with the contingent-fee agreement, but then to adjust the figure that agreement produces on the basis of factors (most notably, the actual time spent multiplied by a reasonable hourly rate, *ante*, at 1828) that are, in a sense, the precise antithesis of the contingent-fee agreement, since it was the very *purpose* of that agreement to eliminate them from the fee calculation. In my view, the only possible way to give uniform meaning to the statute's "reasonable fee" provision is to understand it as referring to the fair value of the work actually performed, which we have held is best reflected by the lodestar.

Gisbrecht, 535 U.S. at 809 (emphasis in original).

8

### B. Louisiana Rules of Professional Conduct

Rule 1.5 of the Louisiana Rules of Professional Conduct ("LRPC") governs agreements for and collection of attorney's fees. Rule 1.5(c) relates to contingency fees:

> A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by Paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client. A copy or duplicate original of the executed agreement shall be given to the client at the time of execution of the agreement. The contingency fee agreement shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; the litigation and other expenses that are to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

Moreover, Rule 1.5(a) lists a number of factors to be considered in determining whether a fee is reasonable, many of which overlap with the lodestar method:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

### C. Louisiana Jurisprudence

The Louisiana Supreme Court has outlined a specific process for determining the appropriate measure of attorney's fees under contingency fee contracts which have been terminated before completion of the representation. The two seminal cases detailing this process are O'Rourke v. Cairns, 683 So. 2d 697 (La. 1996) and Saucier v. Hayes Dairy Products, Inc., 373 So. 2d 102 (La.1978).[12] The process is dependent upon whether the attorney has been terminated with or without cause.[13] As a precursor, however, the court in O'Rourke noted that "[a] calculation based on hours alone is a bright-line rule which fails to consider the unique character of the contingency fee contract, including risks not encountered in hourly or fixed fee agreements, which Louisiana courts have recognized for many years." 683 So. 2d at 703.

When an attorney retained under a contingency fee contract is prematurely discharged *without cause,*

> [T]he amount of the fee [is] to be determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed. Further, that fee

---

[12] The Saucier court indicated that a successor attorney must be joined as an indispensable party "for a full and proper adjudication of" the fee dispute. Saucier, 373 So. 2d at 119; accord James Minge & Assocs. v. Hanover Ins. Co., 692 So. 2d 728, 730 (La. App. 4th Cir. 1997) ("Following the dictates of Saucier we find that [discharged counsel's] successor attorney... who negotiated the settlement on his behalf is a party necessary for a just adjudication of these proceedings."). As observed infra, this is not a "successor" attorney situation.

[13] The Fifth Circuit has definitively applied the Saucier and O'Rourke cases (albeit in an unpublished opinion), see Howe v. Scottsdale Ins. Co., 218 F.3d 744 (5th Cir. 2000) (table) and has recently cited them as governing authorities in contingency fee disputes, see Hall-Williams v. Law Office of Paul C. Miniclier, PLC, 360 Fed.Appx. 574, 581, n.4 (5th Cir. 2010).

10

should in turn be allocated between or among the various attorneys involved in handling the claim in question, such fee apportionment to be on the basis of factors which are set forth in the Code of Professional Responsibility.

Id. at 702 (quoting Saucier, 373 So. 2d at 118). The factors to which the Saucier court referred are now codified at Rule 1.5(a) of the LRPC, as quoted above:

> (1) The time and labor involved, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) The fee customarily charged in the locality for similar legal services; (4) The amount involved and the results obtained; (5) The time limitations imposed by the client or by the circumstances; (6) The nature and length of the professional relationship with the client; (7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) Whether the fee is fixed or contingent.

Id. at 702, n. 12. Furthermore, the O'Rourke court specifically held, and reaffirmed, "[t]he amount prescribed in the contingency fee contract, *not quantum meruit*, is the proper frame of reference for fixing compensation for the attorney prematurely discharged *without cause*." Id. at 702 (quoting Saucier, 373 So. 2d at 118) (emphasis in original).

However, when an attorney retained under a contingency fee contract is prematurely discharged *with cause*,

> the trial court should determine the amount of the fee according to the Saucier rule, calculating the highest ethical contingency to which the client contractually agreed in any of the contingency fee contracts executed. The court should then allocate the fee between or among discharged and subsequent counsel based upon the Saucier factors. Thereafter, the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the Saucier allocation.

Id. at 704. Finally, determining whether an attorney was discharged with or without cause "is a factual determination [which] will only be disturbed on appeal upon a finding of manifest error." Id. at 703.

### III. The Trial Evidence and Fee Award Analysis

Determining appropriate attorney's fees for the attorneys in this case is an unusual exercise, to be sure. Most contingency fee claims stem from the standard personal injury matter, where the determination of the base amount is fixed, the attorney is dealing with an often unsophisticated individual, and there are two attorneys fighting over one contingency fee. This suit, however must resolve multiple claims arising out of contingent contracts with a more sophisticated client, a municipality, in a commercial case. Additionally there are two contracts, with essentially the same terms, but one of which is joint between two attorneys, Mr. Sharp and Mr. Davidson. Mr. Sharp was disbarred forcing his resignation from representation; Mr. Davidson was not. The attorneys were all in the odd, but not unusual, position of representing a municipality, with a certain degree of split loyalty between the mayor's office and City Council with particular stresses regarding the underlying claims against Cleco. Further, there is no "successor" attorney in the contingent sense, as the replacement counsel hired when the claimants were discharged billed the City on a strict hour and expense basis. Finally, there is a dispute here as to the value of the services provided by the claimants, and the kind and amount of that value inevitably differs as to each, as will be seen.

To determine the appropriate approach in adjudicating these fee claims, we must first begin with the relationship of an attorney vis-a-vis his client in this unusual

representation. In this case the evidence reflected that the contracts were executed by the former mayor **prior to** the contracts being approved by the City Council. Indeed the evidence is that suit was filed even before this so-called ratification by the council took place. The attorney claimants have attempted to put much stock in this council "ratification" claiming, in part, that their real client was the council and not the City administration. The practical problem was that the City administration changed during the early days of the representation. Mayor Ned Randolph, who was signatory on the contracts, retired and was replaced in the election of 2006 by Jacques Roy, the City's current mayor. A measure of disagreement as to case handling strategy quickly developed between the mayor and council, and that change of strategy by the administration likewise created stresses with the City's lawyers. The lawyers thought the case should be settled. The administration had different ideas at that point in time. Without the settlement hoped for, the attorneys would not be paid and they were concerned. The fees would be substantial. The matters got so difficult, particularly with Ms. Brown, that she was discharged, even as she claimed to have the authorization from the council and ran for cover there. Mr. Sharp, to repeat, had to resign from representation when he was disbarred. Mr. Davidson **never** was actually discharged from representation, although it is clear he was marginalized after new counsel enrolled.

It is clear to us under Louisiana law that a client has an absolute right to discharge his attorney. See <u>Farrar vs. Kelly</u>, 440 So. 2d 939, 940 (La. App. 2d Cir. 1983). In the case of a municipality, and particularly the City of Alexandria, the city attorney, who serves at the pleasure of the mayor, has the authority to hire special legal counsel,

and to fire them.[14] Indeed we have previously ruled in this litigation that the city attorney did have the right to discharge Ms Brown.[15] The decision here, therefore devolves into a consideration of whether the claimant attorneys are entitled to be paid based upon the contingency contracts or via *quantum meruit*.

According to her testimony, Ms. Brown was hired primarily to provide some kind of liaison with the council, as she was said to have had a good political relationship with council members. She knew nothing about the complexities of utilities litigation, regulations or rules of the Federal Energy Regulatory Commission, or any of the other technical matters. According to the evidence, Ms. Brown's discharge resulted from her having taken positions directly adverse to the mayor, her use of personal attacks on him, and her attempts to play politics with the council in ways that were directly adverse to the administration. She was not able to maintain that divided loyalty and responsibility required of a lawyer in a municipal representation. Based upon the extensive record that was developed in this case and six days of testimony, we are convinced Ms. Brown was clearly discharged for cause. Her only remedy, if any, is in *quantum meruit*, and we need not discuss the merits of the contingency fee contract further. The one and only basis under which she might recover anything arises from her representation in the very early stages, while Mayor Randolph was still in office. There was some evidence she was mildly helpful in convincing members of the administration and council that the suit had merit, at least enough to file it, although the degree and level of her actual involvement

---

[14] City of Alexandria, Charter, Doc. 178-2, Exh. B, § 4-02.

[15] See Doc. 440.

14

in that remains quite unclear. Likewise, her lodestar calculation[16] provided little useful information as to time she purportedly spent that was for legal work. It is obvious the lodestar calculation was not constructed from any kind of contemporaneous time entries and is essentially worthless. Still, it is her discharge for cause and the circumstances of such discharge that are the determining factors here. What "work" she did was essentially non-productive, did not foster the appropriate resolution of the case, and certainly did not contribute anything of substantial value even while she was employed. Her representation, then, had a zero value for awarding attorney's fees which would be payable from the public fisc.

Mr. Sharp's situation is quite different. His representation remained long after Ms. Brown's but he, too, became adverse to the City's case-related goals at a rather serious point. Having a fixed settlement number in the spring of 2008 after participation in substantial mediation activities on the case, Mr. Sharp was convinced the administration should settle **then**. The problem with his representation at that point was that he began to think **he** was in charge of whether the City would settle or not. That, unfortunately, was at odds with the mayor's views. Thus, Mr. Sharp did, to some degree, become an estranged lawyer insofar as the representation was concerned. The strain was certainly not similar to Ms. Brown's, and all agreed that his work through the mediation process and getting the case to the point of his discharge had value. Nonetheless, his own misconduct and disbarment also acted as an impediment to his completion of the case and required the City to retain new counsel, rework the entire case strategy and

---

[16] Claimants' Joint Exh. 255.

progress, and incur very substantial attorney's fees with replacement counsel. In our view the only way to compare apples to apples here is to consider all the factors in making a *quantum meruit* determination. We compute fees owed to him as follows:

All parties concede and admit that the maximum value of Mr. Sharp's contingent contract is approximately $5.07 million, based upon a valuation placed on the final settlement reached in the underlying litigation. Mr. Sharp's basic lodestar calculation yields a sum of $1,124,700.00, based purely upon hours expended.[17] According to the materials submitted by the City's replacement counsel, their total fees for bringing the matter to final conclusion were $1,522.691.15.[18] Had those attorneys been replacement **contingency** fee counsel, we might compare the relative amounts of work and split the fee accordingly. Here, instead, we must consider all of the factors discussed regarding Mr. Sharp's representation. Such representation did have value in getting the case to a point, even though not a final point. These reflect the LRPC Rule 1.5(a) factors of the amount involved and results obtained, as well as the nature and length of the professional relationship. We consider that Mr Sharp's attitude in his lack of deference to the City's strategy to have been a particularly negative factor,in addition to his disbarment, as discussed above. All things considered, we find the amount of $700,000.00 represents a fair allocation of fees to Mr. Sharp and make an award in that amount.[19]

---

[17] Claimants' Joint Exh. 211.

[18] Doc. 693, p. 17.

[19] Mr. Sharp has not enumerated any expenses which may still be owed to him. (Doc. 695.)

The claim of Mr. Davidson is entirely different. Mr. Davidson was never discharged as counsel for the City and his contribution was substantial to a point. Although he was later removed from any decision-making, this occurred well after he had participated fully in the mediation process and had poured numerous hours into the case. While he admitted his lack of expertise in utility law at the outset, he brought good skills to the representation. He was in no way involved in Mr. Sharp's disbarment and had not even been informed the disbarment was occurring until it was imminent. Mr. Davidson's lodestar calculation of $1,026,375.00[20] is detailed but likely not from contemporary time records. Accordingly, while it is reconstructed, it is helpful to some degree in calculating a proper fee.

But what fee? The City has contended the contract with Mr. Sharp and Mr. Davidson was a joint venture and, with Mr. Sharp's departure as attorney for the City, Mr. Davidson's representation likewise ended. That argument must fall because the City never dismissed or discharged Mr. Davidson when it dismissed Mr. Sharp. Indeed, the evidence is that Mr. Davidson was specifically told the City had no complaint with him and might be calling on him again, even though it did not. Even at trial no one had anything bad to say about Mr. Davidson. We do not interpret the contract in its reformed fee format to be a joint venture contract, particularly in terms of its context. The exception proves the rule here – Ms. Brown's contract was for one lawyer at a ten percent (10%) contingency. Mr. Sharp's and Mr. Davidson's contract was twenty percent (20%) for two lawyers without any clause dealing with the eventuality that one of them

---

[20] Doc. 493.

would be lost. However, those anomalies are sufficient under the law to turn Mr. Davidson's calculated fee into a *quantum meruit* calculation as well, rather than a strictly enforced contingency fee award. To rule otherwise would require us to attempt a fictional contract reformation or to attempt to divide it to some percentage of shared money. This is so, because Mr. Sharp is not entitled to a contingency fee and there is no severability provision in the contract.

As noted above, Mr. Davidson's base lodestar calculation here yields the following: $1,026,375.00. His maximum contingency fee would be no more than the $5.07 million mentioned earlier in relation to Mr. Sharp, based upon the same admitted settlement value of the final City/Cleco deal. There are no significant specific deductions that apply, except the non contemporaneous nature of the lodestar calculations and the effect of the fees charged by replacement counsel. There are, however, certain upward adjustments that are appropriate based on the preclusion of other employment by Mr. Davidson during the time he was involved in the litigation, the amount at issue, the novelty and difficulty of the questions presented, and the nature and length of the professional relationship between Mr. Davidson and the City, as discussed above. Our reasonable calculation yields that Mr. Davidson should be awarded fees in the amount of $1.3 million, and we do so here.[21]

At this point we must add that one of our considerations is the fact we have had to determine awards payable from public funds, as the actual settlement between the City and Cleco was not a full cash settlement, but involved a complicated formula of

---

[21] Mr. Davidson admitted he has previously been paid for all litigation expenses he incurred. (Doc. 493.)

18

possible future credits. Nevertheless, the City has, as we have said, conceded the value point. Thus we have accepted that amount, $50.7 million, as the base number for consideration of the maximum contingency fee amounts involved in our analysis throughout this opinion. We also make no characterization of the wisdom of any of the decisions made by the City in regard to the underlying litigation. Suffice it to say it was complex, protracted, difficult, and full of pitfalls. In making the awards herein, we note we were in a unique position to watch the involvement, contribution, or lack thereof, of each attorney in the case, and we served as arbiter and often referee in the suit which was constantly before us on motions, other dispute resolution, and substantial case management. The awards here will, then, we hope, finally bring an end to a very difficult chapter for all concerned.

### IV. Conclusion

For the foregoing reasons, this Court RENDERS JUDGMENT AS FOLLOWS: in favor of John M. Sharp and against the City of Alexandria in the amount of $700,000.00 plus legal interest from the date of judgment and costs as provided by law; and in favor of H. Craig Davidson, Jr. and against the City of Alexandria in the amount of $1,300,000.00 plus legal interest from the date of judgment and costs as provided by law. All remaining claims are DISMISSED with prejudice.

A judgment appropriate to this opinion will follow.

SIGNED on this 19th day of July, 2012 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE